UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>          vs.<br><br>ROBERT CHARLES MASSAT,<br><br>                          Defendant. | CR. 15-50089-JLV<br><br><br>ORDER |

## INTRODUCTION

Defendant Robert Massat, appearing *pro se*, filed a motion for compassionate release together with a brief summary of his current medical conditions.   (Docket 185).   Pursuant to the May 1, 2020, Standing Order 20-06, the Federal Public Defender for the Districts of South Dakota and North Dakota ("FPD") and the United States Attorney for the District of South Dakota filed records, submissions and briefing on Mr. Massat's motion.   (Dockets 186-87, 189, 192 & 192-1 through 192-4 & 195-96).   For the reasons stated below, defendant's motion is denied.

## STANDING ORDER 20-06

Standing Order 20-06,[1] captioned "Establishing a Procedure for Compassionate Release Motions Under the First Step Act," put in place "a procedure for submission and consideration of compassionate release motions

---

[1]See https://www.sdd.uscourts.gov/so2006 ("SO 20-06").   SO 20-06 was amended on October 21, 2020, after this case was ripe for resolution.   See https://www.sdd.uscourts.gov/socraa.   The amendments have no impact on the court's analysis of this case.

under the First Step Act, 18 U.S.C. § 3582(d)(l)(A), in the wake of the spread of the COVID-19 virus into the federal prison system." (SO 20-06 at p. 1). Under the order, the FPD is automatically "appointed to represent all defendants in criminal cases: (a) who previously were determined to be entitled to appointment of counsel or who are now indigent; and (b) who may be eligible to seek compassionate release under the First Step Act." Id. ¶ 1. The initial step for the FPD is to

> communicate a recommendation to inmates interested in compassionate release that they immediately submit requests for compassionate release to the warden of the facility in which they are detained, if they have not done so already. These communications will include the recommendation that the prisoner describe their proposed release plan.

Id. ¶ 2.

By the standing order, "within two business days of filing all motions for compassionate release[,]" the FPD and the United States Attorney for the District of South Dakota are "to place [the defendant] into one of four categories[.]" Id. at p. 2 ¶ 4. Those categories are:

> a. High Priority Cases where there exists some combination of: (i) medical issues that correspond to the categories outlined in the commentary to U.S.S.G. § 1.B.1.13; (ii) recognized COVID-19 risk factors in the inmate's medical history; and/or (iii) imprisonment in a federal facility known to have a serious COVID-19 outbreak in its population. . . .
>
> b. Intermediate Priority Cases where identified medical issues and/or COVID-19 risk factors and/or institutional concerns are less extreme than High Priority Cases.
>
> c. Low Priority Cases where there are no identifiable medical issues or COVID-19 risk factors.

2

      d.     Unknown Risk Cases where there is a lack of sufficient information to categorize the request for compassionate release.

Id.  The FPD and U.S. Attorney are to "immediately report the categorization . . . to the Clerk of Court and the Probation Office."  Id.  The standing order contains provisions for sharing of critical information between the FPD, the U.S. Attorney, the Probation Office and the court.  Id. ¶ 5.  The priority of briefing is set according to the different categories of assignment of a defendant.  Id. ¶¶ 6-8.

## FACTUAL BACKGROUND

On November 20, 2018, defendant Robert Massat was sentenced to a term of imprisonment of 180 months for conspiracy to distribute a controlled substance, methamphetamine, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A) and 846.  (Docket 178).  Mr. Massat is currently an inmate at FCI Pekin in Pekin, Illinois.  (Docket 185 at p. 3).  The parties agree and the Bureau of Prisons (BOP) Inmate Locator confirms Mr. Massat has a scheduled release date of July 31, 2028.  (Dockets 192 at p. 11; 192 at p. 1; and https://www. bop.gov/inmateloc/ (last accessed December 7, 2020).  As of this date, Mr. Massat has served about 34.2 percent of the full term of his sentence, and under his current status in the BOP, Mr. Massat's home detention eligibility date is January 1, 2028.  (Docket 187 at p. 96).  He is 41 years old.  Id.

Mr. Massat's *pro se* motion seeks compassionate release on the basis of extraordinary and compelling reasons in light of his personal health during the

COVID-19 pandemic.   (Docket 185).   Mr. Massat's current health conditions include:

- Chronic viral hepatitis C.   (Docket 187 at p. 1);

- Chronic bronchitis.   Id. at p. 2); and

- Obesity.[2]   Id. at pp. 13 & 40;

Mr. Massat's chronic conditions are reaffirmed throughout his medical records. See Dockets 187 & 189.

Mr. Massat argues his "health conditions, particularly his COPD (chronic bronchitis) and obesity, together with other CDC factors relevant to his situation in prison, including his age, place him at a high risk of developing serious compilations if he contracts COVID-19."   (Docket 192 at p. 10).   He contends "[a]ccording to the CDC, a person with chronic bronchitis may be at increased risk of suffering a severe illness as the result of COID-19."   Id. at p. 12 (referencing https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions). In support of this argument, Mr. Massat submits "[a] study of COVID-19 patients

---

[2]A health summary chart lists Mr. Massat as having been diagnosed as "[o]verweight" on January 23, 2020.   (Docket 187 at p. 13).   As of that date, Mr. Massat had a body mass index (BMI) of 39.   The Centers for Disease Control (CDC) considers someone to be at increased risk of severe illness from COVID-19 if they are obese, which is defined as having a BMI of 30 or higher.   See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https %3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcovid-data%2Finvestigations-discovery%2Fhospitalization-underlying-medical-conditions.html (last visited Dec. 9, 2020).

hospitalized in New York City showed 17.3 percent had a chronic respiratory disease; nearly 42 percent were obese with a BMI greater than 30." Id. at pp. 12-13 (referencing Safiya Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, JAMA (Apr. 22, 2020), available at https://jamanetworkcom/journals/jama/fullarticle/2765184). Addressing the failure of the BOP to make an obesity diagnosis, Mr. Massat believes the "BOP has had the data at its disposal to diagnos[e] [him] with obesity, and the ability to address this condition but they have not done so." Id. at p. 16. Instead, he argues "[i]t appears the BOP is doing little or nothing to assist Mr. Massat with treatment of his obesity, short of making two notations in 2019 that he 'appears obese.' " Id. (referencing Docket 187 at pp. 37 & 40).

Regarding his hepatitis C, Mr. Massat contends:

At present, the CDC has no information whether people with hepatitis C are at increased risk for getting COVID-19 or having severe COVID-19. "However, based on available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions, including people with liver disease, might be at higher risk for severe illness from COVID-19, particularly if the underlying medical conditions are not well controlled."

Id. at p. 17 (citing https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease.html).

Addressing the 18 U.S.C. § 3553(a) factors, Mr. Massat emphasizes he "has been in custody since his arrest on October 20, 2015. . . . At FCI Pekin, Mr. Massat has had no entries on his disciplinary record. He has earned already

5

216 days of goodtime credit and is projected to earn a total of 810 days." <u>Id.</u> at p. 20 (referencing Dockets 175 ¶ 3 & 187 at p. 97).   Mr. Massat acknowledged being "housed in a medium security BOP institution." <u>Id.</u> "Concern about danger, if any, to the community," Mr. Massat contends that "may be addressed by a period of home confinement as a condition of [his] release and supervision." <u>Id.</u> Were the court to grant home confinement with electronic monitoring, "Mr. Massat would agree to abide by any such condition." <u>Id.</u> at p. 21.   If released, he plans are "to reside with his sister, Michelle Snap, in Hot Springs, South Dakota and resume employment in the construction industry." <u>Id.</u>

## MR. MASSAT'S CLASSIFICATION

On October 16, 2020, the FPD and the U.S. Attorney filed a notice of categorization of compassionate release motion.   (Docket 186).   They jointly "agree [Mr. Massat's] case should be categorized as an Intermediate Priority case." <u>Id.</u>

## ANALYSIS

Section 3582(c) permits the district court to consider a prisoner's request for compassionate release after he exhausts the administrative remedies mandated by the statute.

> [T]he court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the

6

> factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A)(i).

The court finds Mr. Massat exhausted the administrative procedure provision contemplated by § 3582(c)(1)(A).   On September 3, 2020, Mr. Massat wrote the FCI Pekin warden requesting compassionate release.   (Docket 185 at p. 1).   As of October 13, 2020, the warden did not respond to the request and Mr. Massat filed his motion for compassionate release with the court.   Id.   The 30-day period contemplated by § 3582(c)(1)(A) began to run from the date the prisoner's request was received by the warden.   It matters not that the warden never responded to Mr. Massat's request.   United States v. Brunston, 18-CR-40145, Docket 68 at p. 4 (D.S.D. May 26, 2020).   Mr. Massat completed the administrative exhaustion contemplated by the statute and his motion is ripe for resolution by the court.

"Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release."   United States v. McCoy, No. 20-6821, 2020 WL 7050097, at *3 (4th Cir. Dec. 2, 2020).   That task was left to the United States Sentencing Commission.   "[I]n promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) . . . [the Sentencing Commission] shall describe what should be considered extraordinary and compelling reasons for sentence

7

reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t).

Prior to the First Step Act, the Sentencing Commission established four categories for "extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."   28 U.S.C. § 994(t).   Those categories generally focus on the defendant's age, medical condition, family situation and any other reasons the BOP deems to be extraordinary and compelling.   U.S.S.G. § 1B1.13 cmt. n.1.   The four categories have not been updated since December 2018 when the First Step Act became law.[3]

The United States Courts of Appeals for the Second, Fourth, Sixth and Seventh Circuits have addressed the court's authority under the First Step Act.[4] See United States v. Brooker, 976 F.3d 228 (2d. Cir. 2020); United States v. McCoy, 2020 WL 7050097; United States v. Jones, No. 20-3701, 2020 WL 6817488 (6th Cir. Nov. 20, 2020); and United States v. Gunn, Case No. 20-1959, 2020 WL 6813995 (7th Cir. Nov. 20, 2020).

---

[3]The United States Sentencing Commission lacks a quorum and "currently has only two voting members, two shy of the four it needs to amend the [U.S.S.G.]."   United States v. Marks, 455 F. Supp. 3d 17, 24 (W.D.N.Y. 2020) (references omitted).

[4]The United States Court of Appeals for the Eighth Circuit had two clear opportunities to address this issue but declined to do so.   United States v. Rodd, 966 F.3d 740 (8th Cir. July 16, 2020) and United States v. Loggins, Jr., 966 F.3d 891 (8th Cir. July 31, 2020).

The Second Circuit identified the question at the heart of these cases, which is "whether the First Step Act allows courts independently to determine what reasons, for purposes of compassionate release, are 'extraordinary and compelling,' or whether that power remains exclusively with the BOP Director as stated in Application Note 1(D)."   Brooker, 976 F.3d at 234.   The Second Circuit concluded "that, despite Application Note 1(D), the First Step Act freed district courts to exercise their discretion in determining what are extraordinary circumstances."   Id.   The court held the language of U.S.S.G. § 1B1.13 "is clearly outdated and cannot be fully applicable."   Id. at 235.   "[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.   Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."   Id. at 237; see also Gunn, 2020 WL 6813995, at *2 (agreeing with the Second Circuit that the Guidelines Manual "does not curtail a district judge's discretion"); Jones, 2020 WL 6817488, at *9 ("In cases where incarcerated persons file motions for compassionate release, federal judges . . . have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13."); McCoy, 2020 WL 7050097, at *8 ("As of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in

9

determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction.").

The court retains its independent authority "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release."  Brooker, 976 F.3d at 237.  See also McCoy, 2020 WL 7050097, at *9 (same); Jones, 2020 WL 6817488, at *9 (same); Gunn, 2020 WL 6813995, at *2 (same).   The purpose of the First Step Act was to expand the availability of compassionate release based on judicial findings of extraordinary and compelling reasons without being restricted to those categories identified by the Sentencing Commission or the rationale used by the BOP before the passage of the First Step Act.

The government opposes Mr. Massat's motion.   (Docket 195).   It argues the "medical records state he is overweight and set forth a BMI of 39 as of January 23, 2020, but they do not support that Defendant is unable to provide self-care."  Id. at p. 5 (referencing Dockets 189 at p. 71 (reference to BMI) & 189 passim (for lack of any indication that defendant cannot provide self-care while incarcerated)).   Despite this claim, the government acknowledges:

> [T]he Department of Justice has determined that, during the COVID-19 pandemic, conditions like obesity with a BMI over 30, which increases risk of severe illness due to COVID-19, present "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), in that the inmate's ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility, by the chronic condition itself.

Id. at pp. 5-6.   In the government's view, "the other circumstances relied on by Defendant are either not supported by the record or not supported by the CDC as conditions which are at an increased risk for severe illness if COVID-19 is contracted."   Id. at p. 6.

The government submits a review of the medical records shows that chronic bronchitis was "not added to his health problems[,]" after a clinical visit on September 18, 2020, and an October 1, 2020, x-ray.   Id.   Because the x-ray found "[m]inimal scarring at the base of the lingula without radiographic evidence for an acute cardiopulmonary process[,]" the government argues the "findings do not support extraordinary and compelling circumstances that Defendant is entitled to release based upon a finding of chronic bronchitis under the catch-all provision or under Application Notes 1(A)(ii)."   Id. at p. 7.

The government submits Mr. Massat's reliance on his hepatitis C for release is misplaced.   It argues because hepatitis C "is not on the CDC's list of . . . conditions which increase an individual's risk for severe consequences if COVID-19 is contracted[,]" the court cannot consider the illness in determining compassionate release.   Id. (referencing https://www.cdc.gov/coronavirus/ 2019-ncov/need-extra-precautions/people-with-medical-conditions.html).

The government asserts Mr. Massat's "ability to provide self-care is not the sole consideration[,]" and the "Court may only reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) if, 'after considering the factors set forth in section 3553(a) to the extent that they are applicable,' the Court 'finds that' either

11

'extraordinary and compelling reasons warrant such a reduction,' . . . 'and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.' "   Id. at pp. 7-8.   The government contends consideration of the 3553(a) factors weighs against Mr. Massat's release.   Id. at p. 8.

First, the government argues Mr. Massat "would pose a danger to public safety if released," as indicated by the nature of his conduct which was the subject of his conviction.   Id.   The government contends:

> Defendant was identified as supplier of methamphetamine in Rapid City and Hot Springs, South Dakota. . . . Defendant was the known leader of the group. . . . The PSR   talks   about   numerous other individuals  .  .  .  the Defendant sold methamphetamine to. . . . Defendant was also known to carry loaded handgun in his vehicles, and when he got rid of the handgun, he started carrying a machete.

Id. (referencing Docket 175 ¶¶ 6, 8 & 10-16).

Second, the government submits "the Court applied the § 3553 factors to Defendant when he was sentenced, previously fashioning the appropriate sentence, and further reducing his sentence would not 'promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from further crimes' nor 'reflect the seriousness of his offense.' "   Id. at p. 9 (internal citation, some quotation marks and brackets omitted; citing 18 U.S.C. § 3553(a) factors).   The government submits Mr. Massat "received a significant reduction in his sentence from the original Guidelines range. . . . and (he) was sentenced to 180 months imprisonment[.]"   Id. (references omitted).   The government argues the defendant's "crime does not warrant an additional

12

reduction.   Such a reduction would not be a deterrent and would be a disparity in sentencing as to other similarly situated individuals."   Id.   For these reasons, the government asks that the court deny Mr. Massat's "motion for a sentence reduction."   Id.

Finally, the government asks that if the court grants Mr. Massat's motion for compassionate release, it "substitute a term of probation or supervised release with a condition of home confinement for the duration of [Mr. Massat's] current sentence of imprisonment" rather than releasing him outright.   Id.   It also asks that

> [i]n order to minimize risks to public health, . . . any order provide release only after Defendant's release and travel plans are in place, and . . . set any release 14 days from the date of its order to accommodate BOP's ability to quarantine [Mr. Massat] prior to his release to protect the community from potential further spread.

Id. at 10.

In reply, Mr. Massat argues BOP's failure to diagnose obesity does not limit a court's finding of "[e]xtraordinary and compelling circumstances."   (Docket 196 at p. 1).   He submits the BOP's conduct "is just evidence of their failure to provide care and also a failure to allow him to have the ability to self-care."   Id. at pp. 1-2.   Mr. Massat claims the BOP's failure to get any "outside records for [his] 'asthma hx' " since August 18, 2020, is further evidence of BOP's ineptitude. Id. at p. 2 (referencing Docket 189 at p. 65).   Particularly, he argues since he "has been prescribed an Albuterol Inhaler to address his respiratory issues."   Id. (referencing Docket 189 at p. 96).

13

"In addition to obesity, Hepatitis C, and a history of chronic bronchitis," Mr. Massat points out he "has a history of smoking. . . . a half a pack a day for 5 years."   Id. at p. 3 (referencing Docket 189 at pp. 17 & 47).   This places him, "according to the CDC, . . . 'at increased risk of severe illness from the virus that causes COVID-19.' "   Id. (citing https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html).

Addressing the current status of FCI Pekin's ability to protect him from the virus, he reports:

> As of November 23, 2020, BOP reports 20 inmates at FCI Pekin have a current confirmed positive COVID-19 test and 172 inmates have "recovered."[5]  Out of the 639 inmates tested 201 have tested positive. . . .  On October 30, 2020, at the time of filing the Supplement, the BOP reported that FCI Pekin had 51 COVID positive inmates and 81 recovered.[6]  On that same date, the BOP was reporting that they had completed 655 inmate tests for COVID of which 138 were positive.[7]   In 23 days, FCI Pekin went from a total of 138 individual inmates with either a positive case for COVID-19 or they had recovered, to 201.

Id.

Mr. Massat objects to the government's statement that he was a "known leader of the group."   Id. at p. 4 (referencing Dockets 175 & 195 at p. 8).   He submits the court "granted a variance and noted a reason was Mr. Massat's 'Role in the Offense,' therefore the court concluded at the time of sentencing that Mr. Massat was not the leader."   Id. (referencing Docket 179 at p. 3).   In addition,

---

[5]Referencing https://www.bop.gov/coronavirus/.

[6]Referencing footnote 5 and Docket 192 at p. 3.

[7]See Docket 192 at p. 3; additional comment omitted.

14

Mr. Massat argues "the court adopted the presentence investigation report with changes including 'specific drug activity claims are removed as not credible—with no government objections.' "   Id. (citing Docket 179 at p. 1).   For these reasons, Mr. Massat contends the government's argument suggesting "he is a danger to public safety is misplaced."   Id. at p. 5.   Public safety and the remainder of "the 3553(a) factors," Mr. Massat argues, "should be applied to [him] today."   Id.

Mr. Massat points out that "[s]ince his sentencing, [he] has not had a single entry on his disciplinary record."   Id. (referencing Docket 189 at p. 191). Mr. Massat asserts he still "has strong family and community ties and is working on his issues with drug dependence. . . . . He is readily employable and has stable housing with his sister. . . . If released, [he] would be able to continue substance abuse treatment while on Supervised Release."   Id. (references omitted).   In conclusion, he asks the court to reduce "his sentence to time served under those terms and conditions deemed advisable . . . and, if the court concludes it necessary, a period of home confinement as a condition of supervised release." Id.

FCI Pekin currently has 252 active cases of COVID-19 among inmates and nine active cases among staff.   https://www.bop.gov/coronavirus/ (Last visited December 7, 2020).   Among its total incarcerated population of 1,114, only 830 inmates have been tested for the virus and there is one inmate COVID-19 test pending.   Id.   Historically, 188 inmates and 31 staff members have recovered. Id.   Based on testing, the facility has a COVID-19 positivity rate of 53 percent.

The CDC found "adults of any age . . . might be at an increased risk of severe illness" because of "[a]sthma (moderate-to-severe)[.]"   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Dec. 9, 2020) (bold omitted).

The National Asthma Education and Prevention Program identifies the two classifications of asthma of concern to the CDC.

Moderate persistent asthma.   Asthma is considered moderate persistent if without treatment any of the following are true:

- Symptoms occur daily. Inhaled short-acting asthma medication is used every day.

- Symptoms interfere with daily activities.

- Nighttime symptoms occur more than 1 time a week, but do not happen every day.

- Lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF [peak expiratory flow] varies more than 30% from morning to afternoon.

Severe persistent asthma.   Asthma is considered severe persistent if without treatment any of the following are true:

- Symptoms:

  ▪ Occur throughout each day.
  ▪ Severely limit daily physical activities.

- Nighttime symptoms occur often, sometimes every night.

16

- Lung function tests are abnormal (60% or less of expected value), and PEF varies more than 30% from morning to afternoon.

https://www.uofmhealth.org/health-library/hw161158 (bold omitted; last visited October 29, 2020).   Exercise-induced asthma will cause a person

> [to be] short of breath, cough, and feel tightness in the chest.   The symptoms usually start about 10 minutes after you start exercising, or 5-10 minutes after you finish.   Sometimes the symptoms come on several hours later. Exercise-induced asthma is most common in kids and young adults with asthma.   This condition is treatable and preventable.

https://www.webmd.com/asthma/qa/what-is-exerciseinduced-asthma (last visited Dec. 9, 2020).

Based on the court's detailed review of the medical records, Mr. Massat's chronic bronchitis is not moderate or severe and does not come within the classification of asthma of concern to the CDC during the COVID-19 pandemic. While Mr. Massat's oxygen saturation was not tested according to his BOP records, no healthcare examiner noted any concern about his breathing.   See Dockets 187 & 189.   They did, however, recommend an Albuterol inhaler for his use as needed.   (Docket 187 at pp. 2 & 23).   This condition does not put Mr. Massat's life at risk.

According to the CDC's new guidance issued October 6, 2020, being a current or former smoker creates an "increased risk of severe illness from the virus that causes COVID-19."   https://www.cdc.gov/coronavirus/2019-ncov/ need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal= https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-p

recautions%2Fgroups-at-higher-risk.html (bold omitted) (last visited Dec. 9, 2020).   It is unclear when Mr. Massat was a half-a-pack a day smoker.   As with his bronchitis, it is evident from the medical records that his past smoking history has not played a significant role in his medical care.

"Hepatitis C is a liver infection" and for over half of the people who are infected it is "a long-term, chronic infection."   https://www.cdc.gov/ hepatitis/hcv/index.htm.   "Chronic hepatitis C can result in serious, even life-threatening health problems like cirrhosis and liver cancer.   People with chronic hepatitis C can often have no symptoms . . . . When symptoms appear, they often are a sign of advanced liver disease."   Id.   Any infection or liver disease may increase the risk of serious illness from COVID-19 by any adult of any age.   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

The BOP medical records list "[c]hronic viral hepatitis C" as one of Mr. Massat's diagnoses.   (Docket 187 at p. 21).   The records report no sign of any illness or complication from or liver disease because of his chronic hepatitis C. See Dockets 187 & 189.   The court finds Mr. Massat's hepatitis C is not an extraordinary and compelling reason either alone or in conjunction with his other health conditions warranting compassionate release.

From a careful review of his medical records detailing these conditions, the court finds Mr. Massat's obesity constitutes a major health issue and a chronic risk factor.   That is, his condition will only persist and likely worsen over time. During the COVID-19 pandemic, Mr. Massat's condition significantly diminishes his ability to provide self-care within the environment of a correctional facility, putting him at risk of severe illness—and even death—should he contract the virus.

The court finds Mr. Massat's chronic medical condition makes him especially vulnerable to COVID-19, even compared to other individuals incarcerated in FCI Pekin or another BOP facility.   Against this finding, the court must consider if compassionate release comports with the § 3553(a) factors.

In Mr. Massat's case, the "nature and circumstances of the offense"— conspiracy to distribute methamphetamine—is serious.   18 U.S.C. § 3553(a)(1). "[T]he history and characteristics of the defendant," requires the court to consider the defendant as a whole person.   Koon v. United States, 518 U.S. 81, 113 (1996).

Mr. Massat has a history of two prior groups of felonies for drug possession and firearm possession, one group in 1999 and the other group in 2006. (Docket 175 ¶¶ 37 & 39).   His criminal history includes a felony criminal damage to property conviction in 2003 and a misdemeanor simple assault conviction in 2012.   Id. ¶¶ 38 & 41.   Along the way, Mr. Massat also picked up

a conviction for reckless driving, reduced from driving while under the influence, in 2011.  Id. ¶ 40.   According to the facts detailed in the PSR and adopted by the court, Mr. Massat was involved in distributing a significant quantity of methamphetamine in the Hot Springs and Rapid City area for "over two and [a] half years."  Id. ¶ 19.   Based on his extensive criminal history, Mr. Massat had a criminal history category of V at the time of sentencing.  Id. ¶ 72.

While Mr. Massat has no disciplinary writeups while in BOP custody, the court has no expectation his conduct will significantly improve over the next several years.   Given the gravity of the offense, the length of the defendant's sentence and his behavior while incarcerated, continued incarceration is necessary "to protect the public from further crimes of the defendant."   Id. § 3553(a)(2)(C).   Continued incarceration will "provide the defendant with . . . correctional treatment in the most effective manner."   Id. § 3553(a)(2)(D).   The court finds Mr. Massat poses a danger to public and he is not eligible for compassionate release under 18 U.S.C. § 3582.

**ORDER**

No good cause having been proven, it is

ORDERED that defendant's motion for compassionate release (Docket 185) is denied.

Dated February 1, 2021.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE

20